IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KIMBERLY D. INBODEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-915-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kimberly D. Inboden seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### **Procedural History**

Plaintiff applied for benefits in April, 2011, alleging disability beginning on September 1, 2009. (Tr. 20). After holding an evidentiary hearing, ALJ Michael Scurry denied the application in a written decision dated March 21, 2013. (Tr. 20-32). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### **Issues Raised by Plaintiff**

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 20.

1.    The ALJ erred in not giving appropriate weight to the opinions of plaintiff's treating physician, Dr. Amar Sawar, and to the state agency consultants.

2.    The ALJ erred in assessing plaintiff's credibility and her residual functional capacity (RFC).

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the

2

listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to

3

establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Inboden was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above.   He determined that plaintiff had not worked at the level of substantial gainful activity

4

since the alleged onset date and that she was insured for DIB through December 31, 2013.  He found that plaintiff had severe impairments of lumbar, cervical and thoracic degenerative disc disease, lupus, obesity, fibromyalgia, migraine, celiac disease, GERD, Sjogren's disease, pain disorder, adjustment disorder and major depressive disorder.[2]  He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Inboden had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of limitations.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.  She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1974, and was almost 34 years old on the alleged onset date of September 1, 2009.  She was insured for DIB through December 31, 2013. (Tr. 147).  She had completed two years of college.  (Tr. 151).  A prior

---

[2] Sjogren's disease "is a disorder of your immune system identified by its two most common symptoms — dry eyes and a dry mouth."  The condition "often accompanies other immune system disorders, such as rheumatoid arthritis and lupus."  See, http://www.mayoclinic.org/ diseases-conditions/sjogrens-syndrome/basics/definition/CON-20020275, visited on May 18, 2015.

application for benefits had been denied on June 1, 2007.   (Tr. 147).

In her initial Disability Report, plaintiff said she was unable to work because of a number of problems including fibromyalgia, lupus, neuropathy, bulging discs and migraines.   She was 5'2" tall and weighed 261 pounds.   She said she stopped working on September 12, 2019, because of her condition.   (Tr. 150-151).

Plaintiff had worked in the past as a certified nurse's assistant and a home health aide.   She also did factory work.   (Tr. 172).

Ms. Inboden submitted a Function Report in May, 2011, in which she said joint pain made it hard to get around and her constant pain required medication, which made her fatigued.   On a typical day, she got her kids off to school, fixed her breakfast, took her medicine, took a bath, planned her day's activities, made lunch, took more medicine, and took a nap.   When her children got home from school, she tried to assist with chores and supper, and went along with her spouse on errands, if possible.   Her medicines caused drowsiness.   (Tr. 181-182).   She said that she could not lift more than 10 pounds and had to rest after walking 30 feet. She took medications for anxiety and depression.   (Tr. 188-189).

In September, 2011, plaintiff reported that she had tried many things to combat her fatigue, without success.   Her head was foggy and she was drowsy all hours of the day.   She could not turn, twist or bend because of her back.   (Tr. 214).

### 2.   Evidentiary Hearing

Ms. Inboden was represented by an attorney at the evidentiary hearing on February 4, 2013.   (Tr. 41).

Plaintiff lived with her husband and 12 year old daughter.   Her older son and stepson had moved out in the last year.   (Tr. 50).

Plaintiff testified that she was diagnosed with fibromyalgia in 2009.   She had tried physical therapy, aqua therapy and medication, but they only relieved her pain for a time.   (Tr. 60-61).

On a typical day, plaintiff did not do much.   She took several rounds of medications during the day, which made her drowsy.   She took a nap after lunch. (Tr. 61-62).   She testified that she could not work while taking her medications because she had a hard time concentrating and her medicines made her "very, very drowsy."   (Tr. 70).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which corresponded to the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to only occasional climbing of ladders, ropes and scaffolds, no concentrated exposure to hazards such as unprotected heights, and limited to semi-skilled, less than complex tasks; she was able to maintain concentration, persistence and pace for such tasks with no more than average production standards.

The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do. Examples of such jobs are office helper, cashier and janitor/housekeeper.   (Tr. 81-82).

### 3.    Medical Treatment

Ms. Inboden went to the emergency room after a car accident on December

11, 2009.   She denied pain in her head, neck or back.   She was diagnosed with a sprained right foot.   (Tr. 307-313).   On December 22, 2009, she began seeing a chiropractor for low back pain.   She was treated by the chiropractor through September 3, 2010, with some improvement in her low back pain.   (Tr. 848-868).

She had a hysterectomy in January, 2010.   (Tr. 356).

Dr. Tibrewala, a gastroenterologist, saw plaintiff in July, 2010, for symptoms of GERD.   Plaintiff told the doctor that she was sleeping well, and she denied headaches or seizure activity.   On exam, she had no swelling of the extremities. The doctor noted that she had a normal range of motion of the musculoskeletal system with no bone or joint tenderness.   (Tr. 381-382).

Ms. Inboden went to the emergency room for a severe headache on August 31, 2010.   A CT scan of the head was normal.   The diagnosis was acute migraine headache.   She was treated with medication and released.   (Tr. 634).

In January, 2011, she returned to Dr. Tibrewala complaining of diarrhea for the last 5 to 6 months.   Plaintiff denied a history of depression.   The doctor ordered testing to rule out inflammatory bowel disease.   (Tr. 385-386).   In April, 2011, Dr. Tibrewala noted that Ms. Inboden had been diagnosed with celiac disease and irritable bowel syndrome.   The doctor prescribed medication, and she was to follow-up with Dr. Wachter, her primary care physician.   (Tr. 383-384).

Dr. Amar Sawar, a neurologist, began treating plaintiff on November 30, 2010.   She presented with a number of complaints, including fatigue, body aches and stiffness, headaches, numbness and tingling of both hands, low back pain radiating into the right leg, and headaches.   She also complained of Raynaud's

phenomenon, consisting of bluish to purple discoloration upon exposure to cold. Dr. Sawar's assessment was lupus, fibromyalgia, common migraine and Raynaud's disease.   He ordered diagnostic testing and prescribed medication, including Topamax.[3]   (Tr. 656-658).   An MRI of the head, performed in December, 2010, was normal.   (Tr. 615).   In January, 2011, Dr. Sawar performed a nerve conduction sturdy and EMG which suggested bilateral carpal tunnel syndrome. (Tr. 982-986).   At the next visit, in March, 2011, she said she had not had a recurrence of migraines.   She complained of joint pain and swelling in her hands and dry eyes, mouth and skin.   Examination showed tenderness and swelling of both wrists and tender points in the trapezius area and the knees.   Dr. Sawar prescribed Prednisone and Cymbalta, and ordered an eye exam.   If the eye exam was okay, he would prescribe Plaquenil.[4]   (Tr. 655).   In May, 2011, she reported that her body aches and stiffness had improved.   He told her to continue taking Cymbalta and Plaquenil.   (Tr. 654).

Ms. Inboden saw Dr. Brandon Scott, a neurosurgeon, on March 10, 2011, for law back pain.   She said she had low back for several years, and it had gradually gotten worse in the last six months.   She complained of pain radiating into her right thigh, along with numbness and tingling.   On exam, she had full motor strength in the upper and lower extremities and she ambulated well.   Recent and remote memory and attention were intact.   Cranial nerves and sensation were intact.   An MRI study showed degenerative disc disease at L4-5 and L5-S1, with no

---

[3] Topamax is an anti-seizure medication which is also prescribed to prevent migraines. http://www.drugs.com/ topamax.html, visited on May 19, 2015.

[4] Plaquenil is used to treat symptoms of lupus and rheumatoid arthritis.   http://www.drugs.com/ plaquenil.html, visited on May 19, 2015.

nerve root impingement.    Dr. Scott did not recommend surgery.    He referred her for pain management and physical therapy.    (Tr. 894-895).

Plaintiff was seen by a physician's assistant at Southern Illinois Pain Management on April 26, 2011.    Ms. Inboden complained of pain in her anterior thighs, posterior neck, right scapula region and in her mid and low back.    She indicated this pain had existed for 6 to 8 months.    She was in physical therapy, which helped somewhat, and was using a TENS unit.    She said she was also being treated for fibromyalgia.    On exam, she weighed 267 pounds.    She had poor attention to hygiene.    Her mood and affect were normal.    Her gait was normal. Lumbar range of motion was normal with pain on flexion.    She had tenderness of the lumbar spine on palpation with no tenderness of the sciatic notches or sacroiliac joints.    Muscle strength was full.    Sensation was normal in the legs.    An MRI of the lumbar spine from December, 2010, showed disc desiccation at L4-S1 and mild disc bulge at L4-5 and L5-S1.    There was no nerve root impingement or central canal stenosis.    The PA scheduled her for a lumbar epidural steroid injection.    (Tr. 369-371).

The injection was done on May 19, 2011.    (Tr. 675).    Ms. Inboden returned to Southern Illinois Pain Management on May 31, 2011.    She said that "the injection did wonders for her pain."    She was able to "bend over and touch her toes for the first time."    (Tr. 673).

Plaintiff underwent two psychological examinations on May 31, 2011.    A licensed clinical social worker performed a psychosocial assessment on a referral from Southern Illinois Pain Management.    Plaintiff indicated that she had

10

"struggled with depression since she was diagnosed with arthritis at age 19."   She was taking Cymbalta and felt her mood was stable.   She denied suicidal ideation or panic attacks.   She denied feelings of hopelessness, helplessness, worthlessness and uselessness.   She demonstrated good short term memory and denied problems with long term memory.   Plaintiff described her concentration as poor and said she was easily distracted and had difficulty multitasking.   The diagnoses were major depressive disorder, recurrent, with mild features, and pain disorder associated with both psychological factors and a general medical condition.   (Tr. 671-672).

Fred Klug, Ph.D., performed a consultative psychological examination on May 31, 2011, at the request of the agency.   She told him that she had no history of mental health treatment but was currently taking psychotropic medication.   Her dress, hygiene and grooming were appropriate.   She was oriented and her attention span was adequate.   Concentration was good.   Short term and long term memory were intact and she reported that her memory was good.   Reasoning was good, ability to do simple calculations was poor, and abstract thinking was fair. Judgment was good, but insight was only fair.   She had goal-directed and relevant thought processes.   She reported feeling depressed a couple of times a week since her father died in early March, 2011.   Dr. Klug diagnosed pain disorder associated with psychological factors and a medical condition.   (Tr. 665-668).

Adrien Feinerman, M.D., performed a consultative physical exam on June 10, 2011.  Plaintiff complained of joint pain, primarily in her hands, elbows and shoulders, and low back and neck pain.   She also complained of headaches for the

11

past 6 months, controlled by medication.   She had a history of bilateral carpal tunnel syndrome without surgery, and had been diagnosed with lupus at age 19. She had been diagnosed with celiac disease in the past year and complained of diarrhea.   On exam, Dr. Feinerman noted that she had scratches on her arms and legs from working in roses.   She weighed 270 pounds, and was 5'2" tall.   Muscle strength was normal, with no spasm or atrophy.   She had a full range of motion, and no warmth, redness, thickening or effusion of any joint.   Fine and gross manipulations were normal.   Straight leg raising was normal.   Sensation was intact for pinprick, vibration and soft touch.   Memory and concentration were normal.   Dr. Feinerman concluded that plaintiff was able to sit, stand and walk normally, and that she was able to lift, carry and handle objects without difficulty. (Tr. 681-690).

In August, 2011, plaintiff called Dr. Wachter, her primary care physician, and reported that the state (i.e., Medicaid) would no longer pay for Cymbalta.   He prescribed Effexor instead.   (Tr. 1038).

In November, 2011, Ms. Inboden returned to Dr. Sawar with a complaint of left knee pain with a giving away sensation upon walking.   He ordered an MRI of the knee to rule out a meniscal tear.   She also told him that she had been taking Prozac instead of Cymbalta because her insurance would not pay for Cymbalta. Her body aches and stiffness had improved.   (Tr. 981).   The MRI showed no internal derangement or other significant abnormality.   (Tr. 970).   She returned in February, 2012, and no knee complaints were noted.   She said she had carpal tunnel surgery on the right, which resolved the numbness and tingling in her right

12

hand.   Her last migraine had been four months ago.   She complained of fatigue.
On exam, strength was full in all extremities and sensation was intact.   Joint
examination showed no swelling or tenderness, and she had a full range of motion.
She had no spinal tenderness.   Dr. Sawar told her to continue with Prozac and
Plaquenil, as well as Celebrex as needed for joint pain.   (Tr. 980).

In March, 2012, plaintiff consulted Dr. Scott regarding neck and head pain.
A cervical MRI showed a broad based disc herniation at C4-5 with no
neuroforaminal narrowing.   Dr. Scott did not recommend surgery.   He suggested
physical therapy and a possible injection at C5-6 from a pain center.   (Tr. 893).

Ms. Inboden saw Dr. Sawar again in June and October, 2012.   In June, she
complained of right shoulder pain, dry mouth and burning and itching of her eyes.
Her body aches and stiffness were well controlled.   On exam, she had tenderness
over the right subacromial bursa.   Dr. Sawar diagnosed right subacromial
bursitis, rule out rotator cuff tear.   He recommended a shoulder MRI.   (Tr. 978).
The MRI showed a partial tear but no retracted full thickness tear or bony rotator
cuff outlet impingement.   (Tr. 969).   When she returned in October, she said she
was having migraines about 2 times a week.   Her dry mouth had improved with
medication.   Physical examination was normal except for tenderness over the
upper trapezius, lateral epicondyle and bilateral greater trochanter.   She had no
spinal tenderness.   (Tr. 977-978).

Dr. Roland Barr performed right carpal tunnel release surgery in October,
2011.   In February, 2012, she had "excellent healing" and was able to return to
normal activity.   Dr. Barr noted that she had been wearing a wrist brace for

bowling. (Tr. 1130). Plaintiff returned to Dr. Barr for treatment of her right shoulder pain in October, 2012. He reviewed her MRI and diagnosed rotator cuff tendonitis with possible partial rotator cuff tear. He recommended an injection and a trial of physical therapy. (Tr. 1120-1121). He subsequently scheduled her for arthroscopic surgery on December 6, 2012. (Tr. 1116). The operative and postoperative records were not submitted to the ALJ.

The last record of treatment by Dr. Sawar is from January, 2013. Ms. Inboden saw Dr. Sawar for blurring in her right eye. She had already scheduled an appointment with an ophthalmologist. She also complained of excessive daytime sleepiness and loud snoring. She denied headache or dizziness. On exam, strength was full in the extremities and sensation was intact. She had tenderness over the upper trapezius, lateral epicondyle and bilateral greater trochanter. Dr. Sawar told her to stop taking Plaquenil until she was cleared by an ophthalmologist. (Tr. 1151).

### 4.   Dr. Sawar's Opinion

In October, 2011, Dr. Sawar completed a form entitled "Medical Source Statement – Fibromyalgia." He said that Ms. Inboden met the American College of Rheumatology criteria for fibromyalgia and that her prognosis was poor. In response to a question that asked him to identify the clinical findings, laboratory and test results that show the patient's medical impairments, Dr. Sawar wrote "no specific markers for fibromyalgia." The next question asked him to check off which of a list of symptoms the patient had. He checked a total of 17 symptoms, including 11 tender points, chronic fatigue syndrome, irritable bowel syndrome,

"frequent, severe headaches," anxiety, panic attacks and depression.   He indicated that emotional factors contributed to the severity of Ms. Inboden's pain.   He noted that she had medication side effects of drowsiness and "foggy head."   Dr. Sawar said that plaintiff could stand/walk and sit for a total of less than 2 hours a day, that she would need to take unscheduled breaks during the day, and that she should elevate her feet during prolonged sitting.   He indicated that she had "significant limitations with reaching, handling or fingering," but did not answer a question which asked him to state the percentage of the day that plaintiff could do these activities.   He said that plaintiff would have good days and bad days, and that flare-ups could last for weeks, and she may be totally bedridden for some days. (Tr. 741-745).

###### 5.    RFC Assessment

In July, 2011, a state agency consultant evaluated plaintiff's physical RFC based upon a review of the records.   Dr. Julio Pardo concluded that plaintiff could do work at the light exertional level, i.e., frequently lift 10 pounds, occasionally lift 20 pounds, sit for a total of 6 hours a day, and stand/walk for a total of 6 hours a day, with unlimited ability to push/pull and operate hand and/or foot controls.   She was limited to only occasional climbing of ladders, ropes and scaffolds and should avoid concentrated exposure to unprotected heights and dangerous machinery "due to vertigo and blurry vision."   Dr. Pardo stated that he gave "considerable weight" to Dr. Feinerman's report of his consultative examination.   (Tr. 711-718).

### 6. Medical Records Not Before the ALJ

The transcript contains medical records that were not before the ALJ.

Plaintiff submitted the additional records to the Appeals Council, which considered them in connection with her request for review.  See, AC Exhibits List, Tr. 5. Thus, the medical records at Tr. 1152-1222, designated by the Appeals Council as Exhibits 44F to 50F, were not before the ALJ.

The medical records at Tr. 1152-1222 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error."  *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).   See also, *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

<u>**Analysis**</u>

Ms. Inboden first argues that the ALJ erred in not assigning controlling weight to Dr. Sawar's opinion.

The opinions of treating doctors are not necessarily entitled to controlling weight.   Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.   *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

20 C.F.R. §404.1527(c)(2) states, in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(c). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion**.** *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

ALJ Scurry gave "little weight" to the opinion because, first, Dr. Sawar "indicated that she would have significant limitations with reaching, handling or

fingering, but did not specify such limitations."   The ALJ also observed that surgery had resolved plaintiff's carpal tunnel symptoms.   However, the carpal tunnel surgery occurred after Dr. Sawar filled out the form.   The second reason given by the ALJ was that the other physical limitations assigned by Dr. Sawar in activities such as standing, walking, lifting and carrying were not "supported by the evidence of record to the degree that Dr. Sawar noted" and that there was no evidence to support his opinion that plaintiff would have repeated episodes of decompensation.   (Tr. 30).

The medical records before the ALJ total 847 pages.   The length of the records is not, of course, an indication of the seriousness of plaintiff's condition. However, the ALJ's review of the medical evidence is relatively brief and mainly highlights portions of the record that support the ALJ's conclusion.   For instance, the ALJ failed to note that plaintiff went to the emergency room for a severe headache in August, 2010, and that Dr. Sawar prescribed Topamax for migraine headache in November, 2010.   (634, 656-658).   He stated that "examinations have revealed no swelling or tenderness of the joints."   (Tr. 27).   He failed to note that Dr. Sawar detected tenderness and swelling of both wrists and tender points in the trapezius area and the knees in March, 2011.   (Tr. 655).   He also failed to note that Dr. Sawar documented a complaint of fatigue in February, 2012, and that Ms. Inboden told Dr. Sawar that she was having migraines about twice a week in October, 2012.   (Tr. 980, 977-978).

The main reason given by the ALJ for assigning "little weight" to Dr. Sawar's opinion was that it was not supported by the evidence.   That analysis cannot be

credited, however, where it rests upon a highly selective review of the medical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir. 2014).

Further, having determined that Dr. Sawar's opinion was not entitled to controlling weight, the ALJ was required to consider the checklist of factors set forth in §404.1527. *Scrogham*, 765 F.3d at 697-698. This is not to say that there must always be an explicit discussion of the regulatory factors if it is otherwise evident that the ALJ considered them. Here, though, it is not apparent that ALJ Scurry did so.

The ALJ's review of the medical records emphasized the negative or mild results of x-rays, CT scans and MRI studies without any apparent consideration of the relationship between those studies and the conditions that Dr. Sawar was treating. Dr. Sawar is a neurologist who treated Ms. Inboden for fibromyalgia, lupus and headaches. "Fibromyalgia is a syndrome involving chronic widespread and diffuse pain throughout the body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep." *Estok v. Apfel*, 152 F.3d 636, 637, n. 1 (7th Cir. 1998). According to the National Institutes of Health website, "'[t]o be diagnosed with fibromyalgia, you must have had at least 3 months of widespread pain, and pain and tenderness in at least 11 of 18 areas,' including arms (elbows), buttocks, chest, knees, lower back, neck, rib cage, shoulders, and thighs." *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012), citing http:// www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0001463/. The fact that, for example, MRI studies showed only mild degenerative disc disease in plaintiff's back is of questionable relevance to the conditions that Dr. Sawar was treating. In short, the ALJ's selective review of

19

the medical evidence and superficial analysis of the nature of Dr. Sawar's treatment demonstrate that he did not adequately consider the regulatory factors.

Plaintiff's other point is that the ALJ erred in assessing her RFC. Recognizing that the RFC assessment required an evaluation of plaintiff's credibility, plaintiff includes an attack on the ALJ's credibility analysis under this point.

Plaintiff first argues that the ALJ erred in not accounting for her "severe impairment" of migraine headaches in his RFC assessment.   RFC is "the most you can still do despite your limitations."   20 C.F.R. §1545(a).   In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record."   *Ibid.*

The ALJ found that plaintiff's migraines are a severe impairment at Step 2. 'A severe impairment is an impairment or combination of impairments that "significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c).

In considering plaintiff's migraine headaches, the ALJ noted only that a CT scan of the head was normal and an MRI of the brain was unremarkable.   (Tr. 27). However, diagnostic studies such as CT scans and MRI are not used to diagnose or evaluate the severity of migraines.   Rather, they are used to rule out the presence of other medical conditions that might be causing headaches, such as tumors, infections or brain damage.   See, http://www.mayoclinic.org /diseases-conditions /migraine-headache/basics/tests-diagnosis/CON-20026358, visited on May 19, 2015.

The Commissioner concedes that the ALJ's discussion of the evidence related to plaintiff's migraines is lacking.   She argues that the error is harmless because, based on her review of evidence not mentioned by the ALJ, the result would have been the same.   See, Doc. 25, p. 18.

In relying on evidence not mentioned by the ALJ, the Commissioner violates the *Chenery* doctrine.   See, *SEC v. Chenery Corporation*, 318 U.S. 80 (1943). "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."   *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012).   Her argument also "seem[s] determined to dissolve the *Chenery* doctrine in an acid of harmless error."   *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).   The Seventh Circuit's observation in *Spiva* is applicable to this case:

> The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.

*Spiva*, 628 F.3d at 353.

Because the ALJ's other errors require remand, it is unnecessary to analyze plaintiff's challenge to the credibility determination in detail.   The credibility determination rested in large part on the ALJ's perception that plaintiff's allegations were not supported by the objective medical evidence.   As the ALJ ignored evidence that supported plaintiff's claims, the credibility determination will

have to be revisited on remand.   In addition, the ALJ stated that Dr. Sawar indicated that plaintiff "has not exhibited any specific markers for fibromyalgia." (Tr. 29).   This is a misreading of Dr. Sawar's report.   Dr. Sawar clearly stated that Ms. Inboden meets the American College of Rheumatology criteria for fibromyalgia and that she had 11 tender points.   His remark ("no specific markers for fibromyalgia") was in response to a question that asked him to identify the "clinical findings, laboratory and tests results that show your patient's impairments."   (Tr. 741).   The Commissioner agrees that the doctor's remark meant that there are no specific markers for fibromyalgia, not that plaintiff did not exhibit the markers for the disease.   See, Doc. 25, p. 5.   Further, as the ALJ found that plaintiff does, in fact, suffer from fibromyalgia, the meaning of the ALJ's statement is unclear.

The ALJ is required to build a logical bridge from the evidence to his conclusions."   *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).   ALJ Scurry simply failed to do so here.   Instead, he erred by presenting only a "skewed version of the evidence."   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).   As a result, his decision is lacking in evidentiary support and must be remanded. *Minnick v. Colvin*, 775 F.3d 929, 938-939 (7th Cir. 2015); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Inboden was disabled at the relevant time, or that she should be awarded benefits for the period in question. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

22

## Conclusion

The Commissioner's final decision denying Kimberly D. Inboden's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   May 20, 2015.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

23